These two proceedings for the writ of review are directed at a single award made by the Industrial Accident Commission. Accordingly, they have been consolidated for hearing and determination.
On July 30, 1926, respondent Engelbert, then an employee of a corporation known as the Celite Company, was injured by a fracture of the tibia of his left leg. Petitioner in the two proceedings above entitled was the insurance carrier of the Celite Company. Engelbert made claim for his injury before the Industrial Accident Commission with the result that an award of compensation was made in his favor and against the Celite Company. This award has long since been paid in full.
Because of a certain casualty which occurred on February 27, 1930, which involved the fracture above mentioned and out of which arose a second controversy before the Industrial Accident Commission, it becomes necessary to particularize the condition of Engelbert's leg at various periods between July 30, 1926, and February 27, 1930, as well as to set forth a statement of the activities of the injured man during the same interval of time.
On November 21, 1928, Dr. Karshner, who had taken X-ray photographs of Engelbert's injured leg, reported to Dr. Stewart, who was acting as an expert for the Industrial Accident Commission, that "a.p. and lateral roentgenograms of the left leg show a healed fracture through the shaft of the tibia in its upper third. It is believed that there is a bony union at the present time although the fracture line is quite plainly visible in the lateral view. The alignment of the fragments is good in the lateral view. In the a.p. view there is a considerable outward bowing and slight torsion and the joint surfaces of the knee and ankle are, of course, parallel". This is the complete report of Dr. Karshner as it appears in the record.
Dr. Stewart made an examination of Engelbert's injured member on November 13, 1928, and on the 21st he thus reported to the Commission, in part: "Mr. Engelbert gives a history of an injury to his left leg about 2 1/2 years ago. . . . The injury was in the nature of a compound fracture of the leg near the knee joint and minor bruises. . . . He was in the hospital about 8 months. He was then placed *Page 271 
in a leg brace which he wore for 6-7 months, and he was then told to leave off the brace to strengthen the bone. The wound on his leg has been healed about 1 1/2 years, and since the time of his rating he has been working at light duty in the oil fields. He states that while in the hospital Dr. Gaulden removed some infected bone. At the present time Mr. Engelbert is complaining of the leg being weak requiring him to wear his brace at all times, this weakness he blames on the deformity. An examination of the patient shows a very adherent scar in the upper third of his left leg. Near the center of the scar the bone is very prominent. . . . There seems to be some spring in the fracture. X-rays taken by Dr. Karshner . . . demonstrate apparently solid union although the fracture line is still apparent. . . . It is my opinion that Mr. Engelbert has a real and true disability that is permanent in character without surgical measures are instituted to alleviate it. It is my opinion further that in a man of his years and health that one would be justified in doing a tubular skin graft from the thigh to replace the dense scar over the crest of the tibia and that when this has taken to proceed with an osteotomy of the tibia and putting the leg up in traction or cast as circumstances would indicate in order to correct the present malalignment."
Dr. Gaulden made to petitioner, on January 9, 1930, a report which reads, in full: "Mr. Engelbert reported to our office today for check-up examination to determine whether or not it will be necessary to do a bone graft operation on his fractured tibia. On examination today I find apparent firm union in patient's injured leg. X-rays made of the leg show that the fracture line is still in evidence but there has been some bridging across by callous formation. This patient at the present time is working and has been working since Sept. 30, 1929. He still wears his brace as a support to his leg. He was instructed to report back at the end of three or four months at which time further X-rays will be made and patient will be examined. Inasmuch as he is apparently getting firm union at the fracture seat I do not believe at this time it will be necessary to perform an open operation on his leg."
On March 7, 1930, Dr. Gaulden made a report to the State Compensation Insurance Fund in which he said, in part: *Page 272 
"Mr. Engelbert has been under my care for an old compound fracture of his left leg since July 30, 1926. He was last seen by me on Jan. 9, 1930, at which time his leg was X-rayed. These films showed the fracture line was still in evidence tho there was apparently some callous formation. On physical examination union was apparently firm."
Dr. Cade, under date March 19, 1930, made a report to the State Compensation Insurance Fund. In this paper the doctor first analyzes the showing made to him by an inspection of the four X-ray films of Engelbert's leg, taken by Dr. Gaulden. As to one of these, after stating certain particulars shown by it, Dr. Cade says: "Solid bony union does not appear to be complete in this particular X-ray film." As to a second, he remarks that "although a great deal of the bony tissue has been replaced with callous formation, however solid bony union of the fracture is far from complete". As to the remaining two, the third and the fourth, which he treats together, the doctor observes that they "show the condition to be practically the same as revealed in the" second film.
This is a complete statement of the evidence respecting the condition of Engelbert's injured leg from July 30, 1926, to February 27, 1930, so far as it is pertinent here, and we now set down an account of Engelbert's activities during the same period. The injured man was under no employment between July 30, 1926, the day upon which he suffered his initial injury, and August 9, 1927, upon which latter date he again took up an employment with the Celite Company, this time at office work, although he was still compelled to wear a brace for the support of the injured leg. His earlier position with the company was as operator of a gasoline locomotive. Up to December 1, 1927, his compensation in this second employment was $100 per month, but on that date it was increased to $125 per month and so remained until August 4, 1928, at which time he voluntarily left the employment with the company. From that date to October 1, 1928, his leg bothered him and required some treatment, and he was consequently out of employment. On the last-mentioned day, however, he commenced work as a fireman with C.C. Julian at the oil-fields at Santa Fe Springs, at a compensation of $125 per month, and retained the employment at that salary until *Page 273 
July, 1929, when he underwent a skin graft operation for the purpose of relieving a scar over the site of the fracture of the tibia, an operation which had nothing to do with the fracture itself. From the disability occasioned by this operation he was recovered by September 29, 1929, when he entered the employ of respondent Signal Oil Gas Company as a watchman, at a compensation of $42 per week of seven days. He retained this position, at the wage named, until February 27, 1930, the date of the second casualty involving the fractured tibia.
After the injury of 1930 Engelbert applied to the Industrial Accident Commission for an award of compensation therefor, and such proceedings were had thereupon that an award was entered against the Celite Company. Petitioner here, the insurance carrier of that company, now contends that the award should be annulled, insisting that any award in the proceeding should have gone against the Signal Oil Gas Company. The State Compensation and Insurance Fund is before us for the reason that it was the carrier for the last-named company.
The manner in which Engelbert was injured while in the employ of the Signal Oil Gas Company is shown by his testimony alone. The claimant said that he was walking downhill and "slipped and fell in a sitting position, my leg under me, injured leg under me," and "right away I felt a severe pain where the old fracture was. . . . I tried to stand and I couldn't. I whistled and called" the boss and the superintendent of the employer. These two men helped Engelbert up and carried him to a machine, by means of which he was taken to a hospital. On cross-examination Engelbert testified that when his leg doubled under him his "foot turned back", that when he came down on the leg he had "severe pain at site of old fracture", that "prior to that time" he had "not any more" pain in the leg "than just usually uncomfortable from wearing the brace". The record then shows: "Q. When you came down on the leg . . . did you come down hard or easy or how, do you know? A. Well, just I slipped I guess down the hill, I would say four or five feet."
We pause for a moment to consider this state of the testimony. It is quite evident from the entire record that the witness said that he "slipped on the grass" and not *Page 274 
"slipped I guess". This is made apparent from the fact that counsel, in later questions, as hereafter will be shown, without comment or objection from the witness, from other counsel or from the referee, used the expression "on the grass" in alluding to Engelbert's slipping. Moreover, it is not likely that the witness would have said "slipped I guess", as he had previously stated positively that he slipped, and he must have remembered positively whether he slipped as great a distance as four or five feet before he went down. These views are quite material to the case. If Engelbert slipped on grass the possibility of his having fallen because of a "buckling" or giving way of his leg is set at naught, when we remember how natural it is for persons with sound legs to lose their footing on a grassy slope. It will be observed, also, that Engelbert has already said that he slipped and fell in a sitting position with his injured leg under him, and that "right away" he felt "a severe pain where the old fracture was". If his leg had buckled or given way the pain would first have been felt at the commencement of his slipping and not after he had fallen to the ground. From a consideration of the entire record, more of which is quoted below, we conclude that Engelbert fell because of a casualty — an "accident", to lapse into ordinary parlance — which might reasonably have happened to one of sound limb, and that the old fracture had nothing to do with his slipping or his falling. We think the record shows no conflict upon this point, but that it is established without dispute.
We resume our statement of Engelbert's testimony. "Q. You werestill on your feet (italics ours) during the four or five feet you were sliding, is that true? A. Yes. Q. Then you couldn't regain — A. Overbalanced and went down." In explanation of what now follows it is to be remarked that Dr. Gaulden performed a bone graft operation on Engelbert's leg after the casualty of 1930. The question with which the following quotation opens has reference to the operation: "Q. That was approximately a week after you slipped on the grass (italics ours), is that correct? A. Yes, sir. Q. Now at the time the bone graft operation was performed so far as you could determine was the leg in approximately the same condition as it was before you *Page 275 
had slipped on the grass (italics ours) . . .?" The answer is not material to our purpose.
We have above quoted from the reports of several experts, the extracts there set forth having a bearing upon the condition of Engelbert's leg between July 30, 1926, and February 27, 1930. Two of these reports also contain matter referring to his condition after the injury of the last-mentioned date. The following appears in Dr. Gaulden's report of March 7, 1930: "This patient was again admitted to my service at the Angelus Hospital on Feb. 27, 1930. He stated that he had slipped and fallen that same morning and refractured his left leg. He was working for the Signal Oil Gas Company when this accident happened. Examination shows abnormal mobility in patient's left leg and X-rays taken of the leg show very little difference from the condition seen in the X-rays that were taken when patient was last seen by me in January, with the exception that there is apparently a fracture line through the small amount of callous that has formed. I had been contemplating doing a bone graft on this patient for some time but when I saw him in January as union was apparently taken [sic] place such an operation had been postponed. Yesterday morning under anesthetic a bone graft operation was performed on this patient." Dr. Cade says, in his report dated March 19, 1930, that he is "unable to see any difference as regards the bony condition existing" as between the first and second films examined by him, on the one hand, and the third and fourth, on the other, the latter two having been taken immediately following the casualty of February 27, 1930. From this state of affairs the doctor concludes that the injury which Engelbert incurred in 1930 "did not cause any aggravation or change in the preexisting condition".
We think there is no conflict in the evidence which lies before us. Much time is taken in the briefs in a discussion of the question as to whether or to what extent there was a bony union, on February 27, 1930, at the line of the fracture which Engelbert suffered in 1926. The only discordant note in the evidence on that subject is to be found in the report of Dr. Cade, which was made from an examination of X-ray photographs alone, while both Dr. Gaulden and Dr. Stewart report that on physical examination of the patient *Page 276 
union at the line of fracture was apparently firm, and that note is not opposed alone by the concord in the evidence found in the reports of the other experts. It seems to us that the point is practically determined by the history of Engelbert's activities from the date of his re-entrance into the employ of the Celite Company in August, 1927, to the time of the casualty of 1930. For much the greater portion of the period, about sixteen months out of twenty, his leg was firm enough to allow him to be at work and to earn a considerable compensation. The injured leg stood the test imposed during the period by the ordinary course of his employments. This we are bound to conclude from the fact that his salary was increased by one employer and was not lessened by the others, that no employment was terminated except upon his volition, and that no evidence was introduced for the purpose of showing that his labors were inefficient or that he was handicapped by the condition of his leg in the performance in due and ordinary course of the duties of any position which he held. His employment with the Signal Oil Gas Company appears to have been the most strenuous in which he engaged. He was in this post from September 29, 1929, to February 27, 1930, a period of five calendar months, less two days, and there is evidence in the record from which it must be inferred that the job was not a sedentary one. It was stipulated at the hearing before the Industrial Accident Commission that the casualty of 1930 arose out of and in the course of Engelbert's employment as a watchman. When he was injured he was therefore where he had a right to be. When he was hurt he whistled and called to two higher-up employees of the company. He therefore must have been on the premises of his employer, on a grassy slope, too, and in the discharge of his daily duties when he was injured. We are driven to state these conclusions, just and proper as they are, because, unfortunately, there is no specific evidence in the record to show what was Engelbert's line of duty as a watchman. Certainly, as we have already said, he worked under successive employments for nearly two years in an evidently satisfactory discharge of his ordinary duties. At last, by means of an accident which might have befallen the most sturdy, his ability to hold an employment was for the time being destroyed. If we add to these reflections, based upon *Page 277 
the story of Engelbert's employments, considerations arising from the fact that the evidence of all the experts except Dr. Cade is opposed to his, we may safely conclude that Dr. Cade's report creates no substantial conflict in the evidence. Be it plainly understood, however, that we proceed upon the theory that all the evidence of the experts pales into insignificance beside the history of Engelbert's activities for so long a time.
[1] This all means that Engelbert's injured leg did notcause the accident which befell him. As a result of the casualty, however, the member was refractured at the old site of difficulty. Here is a distinction which must always be kept in mind. Does the mere fact that the leg was injured at the place of the initial fracture show that Engelbert was entitled to compensation from the Celite Company? We think not. The law is to the contrary. Engelbert's condition at the time of the casualty of 1930 may be likened to that of an employee who has a heart trouble which in no way affects his ability to discharge the ordinary duties of his employment, but whose physical difficulty is enhanced by undue strain or excitement. The Supreme Court has several times passed upon such cases. "If the disability, although arising from a chronic heart trouble, was brought on by any strain or excitement incident to the employment, the industrial liability still exists. Acceleration or aggravation of a pre-existing disease is an injury in the occupation causing such acceleration. . . . It can hardly be doubted under this rule that if decedent's incapacity to drive his truck was caused by a heart attack brought on by exertion or sudden shock or excitement incident to his employment on the highway, recovery could be had" (George L. Eastman Co. v. Industrial Acc. Com., 186 Cal. 587
[200 P. 17, 20]; Knock v. Industrial Acc. Com., 200 Cal. 456
[253 P. 712]).
Respondent relies upon Head Drilling Co. v. Industrial Acc.Com., 177 Cal. 194 [170 P. 157], and Newton v. IndustrialAcc. Com., 204 Cal. 185 [60 A.L.R. 1279, 267 P. 542], but we think neither of these cases is applicable in the present instance.
[2] Respondent Commission makes the point that it was proper to render award against petitioner for the expenses of the bone graft operation performed by Dr. Gaulden. *Page 278 
There is no evidence in the record that this operation was necessary before the casualty of 1930, or that a performance of it was contemplated. The only showing on the question appears in the reports of Drs. Gaulden and Stewart. The former said in his statement of January 9, 1930, that "I do not believe at this time it will be necessary to perform an open operation" on Engelbert's leg. This was for the reason, as stated by the doctor, that the patient was "apparently getting firm union at the fracture seat". This was but six weeks before the event of February 27, 1930. Dr. Stewart had said, only, with our italics, "that one would bejustified in doing a tubular skin graft from the thigh to replace the dense scar over the crest of the tibia and that when this has taken to proceed with an osteotomy of the tibia and putting the leg up in traction or cast as circumstances would indicate in order to correct the present malalignment." In addition to the fact that it is said merely that this procedure would be justifiable, it is to be observed that it was for Engelbert to say whether he desired the malalignment of his leg thus to be corrected. Dr. Stewart made his report on November 13, 1928. A year and two months later Dr. Gaulden, Engelbert's private attendant, said for him that from the evidence then at hand it was unnecessary to perform the operation. The burden was upon Engelbert to show that he was entitled to compensation from the Celite Company for the expenses of the operation which was actually performed after the casualty of 1930, and we think the record is barren of any evidence to support a finding to that effect. Certainly, as it appears to us, the mere fact that the operation was performed when it was, and under the conditions then existing, would not justify such a finding.
Other points are discussed in the briefs but we find it unnecessary to decide them.
Award annulled.
Craig, J., and Thompson (Ira F.), J., concurred. *Page 279